In re Silas Arthur PRATER, Sr., Catherine May Prater, Debtors.

C. Kenneth STILL, Trustee, Plaintiff,

v.

E. S. RANDALL, Defendant.

E. S. RANDALL, Counter-Plaintiff,

v.

DANIEL & GORDON REALTY AND AUCTION COMPANY, Counter-Defendant.

Bankruptcy Nos. 1–80–00931, 1–80–00932. Adv. No. 1–80–0407.

United States Bankruptcy Court, E. D. Tennessee.

Dec. 2, 1981.

Shelley I. Stiles, Nashville, Tenn., for defendant and counter-plaintiff.

Robert S. Peters, Winchester, Tenn., for plaintiff and counter-defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

### Introduction

The trustee filed suit seeking specific performance of a contract for the purchase of a farm. It was sold at an auction sale to Dr. Randall, the defendant, who was the highest bidder.

After the auction Dr. Randall signed a contract to purchase the real estate and paid the sum of $7,250 "as earnest money". The balance was to be paid upon delivery of the deed.

The trustee's deed was prepared and executed, but Dr. Randall refused to pay the balance of the purchase price.

It is the contention of the trustee that he has no adequate remedy at law and therefore he seeks specific performance of the contract to purchase the farm.

It is the contention of Dr. Randall that the contract should be declared null and void "due to misrepresentations made by the plaintiff's agent. . ." Dr. Randall, as counter-plaintiff, alleges that the trustee, through his agent, Daniel and Gordon Realty and Auction Company, made "misrepresentations" which induced the defendant to enter into the contract.

Dr. Randall alleges that he relied to his detriment upon the "misrepresentations" and for that reason the contract should be declared null and void and he should be refunded his deposit of $7,250 plus damages.

### Facts

The court authorized the trustee to sell property of the estate consisting of a 78.3 acre farm with house, barns, and other out buildings located on Highway 82 between Shelbyville and Lynchburg in Moore County, Tennessee.

The trustee engaged the services of Daniel & Gordon Realty and Auction Company to sell the farm at public auction.

The sale was advertised, and prospective buyers had an opportunity to examine the property or to interview the debtors and others with knowledge of the property.

The auction sale was conducted on the premises. A large crowd was present. The defendant, Dr. Randall, was the highest bidder at $72,500. Dr. Randall signed the following contract to purchase real estate:

WITNESSETH: That the seller in consideration *$7,250 DOLLARS* as earnest money in part payment of the purchase price has this day sold and does hereby agree to convey by a good and valid warranty deed to said buyer, or to such person as he may in writing direct, the following described real estate in *Moore* County, Tennessee, to-wit:—

78.2 acres, house, and improvements described in sale announcement.

CONSIDERATION: Buyer agrees to purchase said real estate and to pay therefor the sum of *$72,500* DOLLARS, upon the following terms: *$7,250* cash, balance *with deed.*

The seller hereby agrees to pay all taxes through the year 19*79 & prorate 1980 taxes* on or before *closing.*

It is expressly stipulated that the seller is to give to the buyer an indefeasible title in fee simple which shall be insurable in any title insurance company within thirty (30) days from the date of this contract, and if a defect in the title of the seller shall be ascertained then, if said seller fails to cure any material defects in said title, then this contract shall, at the option of the buyer, become inoperative and shall be cancelled. *Should the buyer default in the performance of this contract on his part at the time and in the manner specified, the earnest money shall be forfeited as liquidated damages but such forfeiture shall not prevent suit for the specific performance of this contract.* (Emphasis added)

Time is of the essence of this contract and all of the conditions thereof.

The trustee's deed was prepared. Dr. Randall was requested to perform in accordance with the contract. He requested additional time to procure financing. The matter continued for a considerable period of time. Dr. Randall contacted the Federal Land Bank and finally arranged suitable financing. Loan closings were scheduled, but on two occasions they were postponed through the action of Dr. Randall. Now Dr. Randall refuses to go through with the purchase.

Dr. Randall alleges that he relied upon the following advertisement by Daniel & Gordon Realty and Auction Company:

78.3 acres of good land. Ideal set-up for feeding cattle—approved site for feeding mash from Jack Daniel Distillery. Two—40 foot concrete troughs. 555 ton concrete silo with automatic unloader and conveyor. Two large ponds. Good ground for raising silage. Several feed lots and woods lot. Approximately 3,000 feet of highway frontage which makes it ideal for future development.

Improved with nice home of 1500 square feet living area; three bedrooms, 18 × 24 den with fireplace, living room, pretty kitchen and dining area, bath, inside utility, carpeting and electric heat; also attached carport. A very livable and attractive home.

Other improvements consist of two good barns and shop building. It would be hard to find a better place to live or a better set-up for feeding cattle in relationship to size.

Dr. Randall feels the above advertisement was misleading. In addition, he alleges on the day of the auction that the auctioneer represented that it would be "no problem" to obtain a mash allotment from the Jack Daniels Distillery.

Dr. Randall further alleges that the auctioneer represented to him that there was a deep well and shallow well, with the inference that there was an adequate water supply.

The defendant testified these misrepresentations were made prior to his bidding on the farm and were relied upon by him.

The defendant finally contends there are latent defects in the property making it unsuitable for feeding cattle. He says there are sinkholes on the property which cause serious problems to adjacent properties.

The plaintiff called the following witnesses:

(1) Bill Daniel
(2) Douglas R. Clark
(3) Silas Prater
(4) Catherine Prater
(5) Ken Still
(6) George Eblen
(7) Joel Steven Alexander

The defendant called the following witnesses:

(1) Dr. Edward S. Randall
(2) Billy Randall

The first witness, Bill Daniel, testified that he had lived in Shelbyville since 1949 and had been in the real estate business more than 30 years. For years, he said, he had driven by this farm and watched Mr. Prater feed 200 to 300 head of cattle.

He testified that his advertisement was not misleading and he denied making any oral misrepresentations regarding adequate water or an allotment of mash.

While there are two ponds for cattle watering, Mr. Daniel testified that on occasion there is a shortage of water in the house. When Dr. Randall inspected the house on the day of the auction he saw jugs being used to store water for drinking purposes. Mr. Daniel testified that while Dr. Randall was in the house he also saw that the water in the bathroom was cut-off. Dr. Randall was told not to use the bathroom "because there is not any water today," according to Mr. Daniel's testimony. In fact, Mr. Daniel turned the water on, flushed the commode, and then turned the water back off.

Mr. Daniel testified that the defendant called him before the sale and also that the defendant had inspected the property before the auction and had looked at it again on the day of the auction and had talked with the debtors.

The next witness was Douglas R. Clark, the Environmental Coordinator for Jack Daniel Distillery. It is part of Mr. Clark's job to inspect farms where mash is fed and advise on good waste management planning. He testified that the farm is an approved site for feeding mash from Jack Daniel Distillery. He further testified that the company "screened" its mash customers and that there is a waiting list. It "could" take a couple of years before getting a mash allotment. Mr. Clark has inspected this farm. He testified there are better and worse farms in Moore County. Mr.

Clark testified that this is a good feeding farm, but when mash is fed the farm needs "planning." Good waste management is necessary because of drainage conditions.

The next witness was the owner of the farm before his bankruptcy. Silas Prater testified that he fed mash and had some drainage problems. He said he cleaned off animal waste. He talked to Dr. Randall before the sale. He testified he was not asked about the mash allotment. He did tell Dr. Randall about the water problem. He showed him the two wells on the property. Just before the bankruptcy Mr. Prater testified he was feeding about 150 head of cattle on the farm and complying with all environmental requirements.

The next witness was the wife, Catherine Prater. She talked to Dr. Randall on the date of the sale. He was in her house and asked about the water. She testified that she told him not to flush the commode because they were "low on water".

The next witness was the trustee who is the plaintiff in this action. He was present at the auction, but did not talk to Dr. Randall. He testified he had advertised the farm in good faith and had been ready to convey the farm on two different closing dates but that Dr. Randall didn't show up.

The next witness was attorney George Eblen who lives in Shelbyville. He was at the auction and described it as fair and reasonable. He testified that he has attended many auctions and saw nothing irregular at this one. He heard the auctioneer mention the "highlights" of the property but heard no specific representation regarding water. He described the property as a good cattle farm.

Mr. Joel Alexander testified about interest on the outstanding loan on the farm and how it is accumulating and the method of calculation.

The next witness was Dr. E. S. Randall, the defendant. He is 55 years old. He has been a doctor of veterinary medicine for 27 years. He has knowledge of cattle and cattle feeding. He has attended four or five other farm auctions. He owns a farm in Rutherford County, Tennessee, which he purchased at a private sale.

He learned of this farm auction sale through an advertisement in the Nashville *Tennessean*. He testified that he looked at the property before the auction when no one was at home. He had already talked to the auctioneer on the telephone.

Dr. Randall testified that he wanted another farm and wanted to feed cattle after his retirement.

On the day of the auction he again looked over the farm and talked to the auctioneer. He was shown the deep well and the shallow well. He felt there was a clear implication of adequate water.

With reference to the bathroom and the water being cut off, he said the auctioneer cut it on and flushed the toilet.

Dr. Randall testified that it was after the auction that the Praters told him about the water shortage. He insisted that he did not discuss it with them before the sale.

As to the mash allotment, Dr. Randall testified that the auctioneer told him "no problem."

Dr. Randall further testified that before the sale he knew nothing about the "sinks" or other problems associated with the property.

On cross-examination Dr. Randall admitted that it was a month or two after the auction before he ever mentioned the "misrepresentations." The auction was on July 8, 1980. Dr. Randall delayed making the purchase. Even after financing was arranged on two occasions he failed to show-up for the closing. The trustee finally filed suit on September 2, 1980. Unknown to the trustee Dr. Randall made an agreement to sell the farm to Woodrow Wilson. After this proceeding was filed this person arranged for another auction sale of the farm on March 27, 1981, by Monks Realty Company.

Dr. Randall testified that he had no knowledge of Wilson's arrangements for an auction of the farm. He admitted that his sale to Wilson fell through because Wilson could not get the financing.

It was never explained how Dr. Randall could sell the farm to Wilson while this lawsuit was pending. Apparently Dr. Randall felt a sale to Wilson would somehow allow him to settle this lawsuit with the trustee.

Mrs. Randall also testified. She knew of no misrepresentations before the sale. Afterwards she saw the Praters who said how bad the water supply was.

The court has carefully reviewed all testimony and the entire record in this proceeding, and makes the following findings of fact:

Exhibit # 1 is the advertisement published by Daniel and Gordon Realty and Auction Co. Dr. Randall alleges that the portion of the advertisement quoted on page 5 of this memorandum contains misrepresentations upon which he relied.

The court finds that the advertisement contained some "puffing" such as "Ideal set-up for feeding cattle..." and "It would be hard to find ... a better set-up for feeding cattle in relation to size." Such statements are not material misrepresentations under all of the facts of this case. The defendant cannot rely upon the advertisement to excuse his performance of the contract.

The defendant, Dr. Randall, is intelligent and well educated. Before the sale he looked at the farm and talked to the Praters who had owned the farm for years.

As to the mash allotment, before the sale Dr. Randall made no inquiry about the allotment to the Jack Daniels Distillery, to the Praters or others who feed mash. The court does not believe that Dr. Randall made inquiry of the auctioneer. The court finds there was no misrepresentation about the mash allotment.

The court believes the testimony of Mr. Prater, Mrs. Prater, and Bill Daniel regarding the water supply. The court finds that before the sale there was no misrepresentation regarding the water supply.

There are "sinks" or depressions on the farm. They either were or could have been seen by Dr. Randall when he viewed the property before the sale. These conditions require management and the control of waste particularly where mash feeding is involved. Jack Daniels Distillery employs an environmental coordinator to inspect farms like this one which are approved sites for mash feeding. He advises farmers regarding a plan for waste management. On this farm Mr. Prater fed mash and managed the animal waste. Dr. Randall had alleged that latent defects made the property unsuitable for feeding cattle.

The court finds that the allegation that latent defects make the farm unsuitable for feeding cattle is not true. With reasonable management, the proof showed this is a good farm for cattle feeding. Cattle have been fed on the farm for years.

*Summary*

The court finds that this bankruptcy sale was conducted without fraud or misrepresentations. About 150 people attended the auction and Dr. Randall was the high bidder.

For almost two months after the auction sale Dr. Randall delayed. Finally a frustrated trustee filed this suit. There were other delays and negotiations. Unknown to the trustee, a person with whom Dr. Randall was dealing attempted another auction sale of this farm.

Two auction sales and this lawsuit would cause a chilling effect on the bidding at another auction.

In waiting a month or two to protest that he was misled, Dr. Randall causes the court to doubt his testimony. It is more likely that he simply decided the farm was not enough of a bargain for him. Sometimes bidders go to a bankruptcy sale hoping for a "steal".

Dr. Randall's bid was no "steal". Mr. Daniel testified it was a little low but it was in an area of reasonableness. Many people were bidding on this property and it would not be likely that the high bid would be a "steal".

The court finds that Dr. Randall's bid was accepted. The proof does not establish any material misrepresentation which would cause the court to declare the contract null and void.

### Conclusions of Law

Plaintiff, C. Kenneth Still, Trustee, claims as relief the remedy of specific performance. He asserts that no adequate remedy at law is available, and cites the recent case of *Shuptrine v. Quinn*, 597 S.W.2d 728 (Tenn.1979). While this case affirms that the remedy of specific performance is available to both seller and buyer, the following guidelines must be consistent.

■ If a contract has all the essentials of validity, and is certain in its terms; is based on an adequate and valuable consideration; is fair and just in all its provisions; is free from any fraud, misrepresentation, illegality, or mistake; is capable of being enforced without hardship to either party, and if compensation in damages for its breach would be inadequate, a bill will be maintained for its specific performance. *Gibson's Suits in Chancery*, 5th Ed., p. 237, Vol. 2.

In this proceeding, the findings of fact indicate no material evidence to support the claim of misrepresentation by defendant, E. S. Randall. Further, the written agreement fairly represents a valid contract and clearly expresses the intent of the parties.

■ The remaining consideration is whether there is an adequate remedy at law available to the plaintiff-trustee. The findings of fact indicate that specific performance of the contract by defendant E. S. Randall would not be inequitable and cause undue hardship. Without specific performance, the trustee is left with the burden of finding another buyer. Meanwhile, the bankruptcy estate will continue to suffer. Interest on mortgages to Federal Land Bank and Murfreesboro Production Credit Association will continue to accrue. Given the uncertainty in time required to find a new buyer and in consummating a fair sale price, specific performance is the only remedy which will insulate plaintiff-trustee from the loss caused by defendant's breach. An award of damages would ignore land as a commodity where the vendor of unique farm property in an unstable or poor market may never establish real harm. Where the contract relates to land, an award of damages is not often an adequate remedy. See *Brister v. Brubaker*, 47 Tenn.App. 150, 336 S.W.2d 326 (1960); 71 Am.Jur.2d, Specific Performance, § 112.

■ Specific performance of the contract will require payment of interest from the date of the sale. If the parties do not agree on the amount, a separate hearing will be held only as to amount of interest.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.